**SEA CREST CONSTRUCTION CORP., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 02–261C.

United States Court of Federal Claims.

Feb. 19, 2004.

## ORDER

HODGES, Judge.

Sea Crest filed a motion for reconsideration of the January 8 Order granting summary judgment on Drawing No. 1 and denying plaintiff's Rule 56(f) motion as Moot. We held that defendant was authorized under its contract with plaintiff to reject Drawing No. 1 as nonconforming. We conferred with the parties on February 11 and denied plaintiff's motion for reconsideration on February 13.

Sea Crest Constr. Corp. v. United States, No. 02–261C (Fed.Cl. Feb. 13, 2004). This Order will address the reasons for that ruling in more detail.[1]

### I. Drawing No. 1

This case involves a government contract for design and construction of a housing development called Stoney Lonesome II at West Point, New York. Sea Crest sent defendant a letter before contract award stating that the contractor would require an allowance for rock excavation. This July 3, 1995 letter stated that plaintiff had included "an allowance for 10,000 cubic yards of rock excavation for site trenching and building foundations." Plaintiff made a similar statement in a July 20 letter. Defendant responded on July 26 by requiring that Sea Crest remove the allowance for excavation[2] and submit a Best and Final Offer. Plaintiff complied the next day.[3]

The Corps awarded the Contract to Sea Crest based on its July 27, 1995 Best and Final Offer. The BAFO stated, "to minimize rock drilling and blasting ... some revisions to the site will be necessary. In accordance with the RFP, the items described ... above will be performed in conjunction with the approval of the Army Corps of Engineers. Pod A, F, B, & C will be included in phase 1, pod G and D will be in phase 2."

Plaintiff and defendant met following contract award to discuss the site design. Sea Crest provided a drawing at the meeting that differed from the design that plaintiff had submitted with its BAFO. This was Drawing No. 1. The drawing showed a long loop road with houses facing the street. Plaintiff knew that the Corps wanted the pod configuration that Sea Crest submitted with its BAFO and referred to in the July 27 letter that accompanied it.[4] The Government rejected Draw-

---

1. *See also Sea Crest Constr. Corp. v. United States,* 59 Fed.Cl. 615, No. 02–261C, 2004 WL 51835 (Fed.Cl. Jan. 8, 2004).

2. The Government asked plaintiff to remove the excavation allowance because of budgetary restraints. Defendant's Notes to the Request for Proposals includes the following: "The Congress ... has established certain cost limitations for the project. The current authorization ... is $22,012,500.00."

3. "We herein retract ... our July 3 and July 20, 1995 letters, thereby eliminating the caveats included in [those letters]."

4. The RFP included a sketch with a caption describing it as A Main Circulatory Spine Acting as the Main Connector, Whereby the Buildings Are in Cluster Arrangements Around Parking Courts. Plaintiff submitted a site plan with the July 27 Best and Final Offer showing 160 housing units in a six-pod layout with cul-de-sacs. Drawing No. 1 did not provide cul-de-sacs or

ing No. 1 because it did not comply with the Corps of Engineers' Request for Proposals on the project.

The record does not show why Sea Crest submitted a new, nonconforming drawing after contract award. Its BAFO design had been accepted by the Government. Plaintiff's counsel stated during a February 11 telephone conference that Drawing No. 1 was an effort to recoup an allowance for blasting and rock-removal costs that the Corps had rejected during pre-bid negotiations. Plaintiff submitted an affidavit that includes the following statement: "Sea Crest proposals for the project were conditioned on certain site work allowances. The pre-award discussions and agreements that were included in the Best and Final Offer and subsequently denied to Sea Crest resulted in excessive site work costs." (Riverso Aff. ¶ 3). It is difficult to know what this means. If pre-award agreements resulted in excessive work costs but nevertheless were included in the BAFO, plaintiff must have adopted them. The BAFO was plaintiff's final offer, and defendant accepted it.

Plaintiff submitted five affidavits with its opposition to defendant's motion for summary judgment. The affidavits did not "set forth specific acts showing that there is a genuine issue for trial" with regard to the issue of Drawing No. 1. Rule 56(e). They consisted of legal opinions and conclusory factual assertions that did not meet the requirements of Rule 56.

Mr. DiSimone was Sea Crest's Contract Administrator and Project Manager. His affidavit states that Sea Crest proposed at a September 18 pre-work meeting to "revise the layout of the housing units, in accord with pre-award agreements, in order to protect the environment and to minimize the amount of excavation and fill, as offered in the BAFO that had been accepted by the Corps." (DiSimone Aff. ¶ 3). Mr. DiSimone does not say what "pre-award agreements" are implicated. The BAFO states, "to minimize rock drilling and blasting ... some revisions to the site will be necessary. In accordance with the RFP, the items described ... above will be performed in con-

junction with the approval of the Army Corps of Engineers." If the parties had agreements concerning excavation problems or the environment that are not in the Contract, these may be subject to the parole evidence rule. Counsel have not argued this issue.

Mr. DiSimone added the following:

Drawing No. 1 was responsive to the RFP, made the most economic and non-destructive use of the site, minimized cut and fill in accordance with Sea Crest's BAFO, allowed for 160 units and provided an efficient and flexible use of a site that was encumbered by its size, historic prohibitions, environmental sensitivity and a restriction that no final grade could exceed 10%.

(DiSimone Aff. ¶ 3). Whether Drawing No. 1 was responsive to the RFP is a legal issue. Whether it made the most economic and nondestructive use of the site is Mr. DiSimone's opinion. Defendant had the right to insist on a site plan that was consistent with its needs, and for which it was willing to pay.

Next, affiant states that the Government rejected Drawing No. 1 and insisted on the "clustered or pod arrangement conceptualized in Sea Crest's pre-award proposals." *Id.* at ¶ 4. He states that the Corps disregarded the BAFO provision that Sea Crest could revise the site plan "in conjunction with the approval of the Corps." *Id.* He added, "Sea Crest was required to design and build a site layout without an opportunity to make any revisions that would minimize excavation and fill, as previously agreed at the time of award." *Id.* He does not say what "previously agreed" refers to here. The BAFO provided that Sea Crest could revise the site plan with the Corps' approval. Plaintiff has not drawn our attention to other agreements, which in any event could be subject to the parole evidence rule.

"It was made clear to the Sea Crest representatives present at these meetings that the ultimate decision-making authority for the Project was Colonel Colacicco and the DHPW representatives and not the Corps,

---

avoid long loop streets. It did not include the

cluster housing that the Corps wanted.

with which Sea Crest had the Contract." *Id.* at ¶ 5. The affiant states that this was a "material departure from the terms of the Contract." *Id.* Plaintiff did not make such an argument, however, which is a legal one. Affiant does not make clear what significance such a fact would have.

"The rejection of Drawing No. 1 violated a number of contract provisions." *Id.* at ¶ 6. This is a legal conclusion. Paragraph 6 describes the relative importance of various aspects of the project that relate to the RFP. These are factors that the Government considered in awarding the Contract. The Government awarded the Contract to Sea Crest. Pre-award evaluation factors have little application to the legal issues at hand.

Paragraphs 7 and 8 merely restate criteria set forth in the Corps' requirements for overall site design. Mr. DiSimone does not offer facts that create genuine issues. He states in paragraph 9 that Drawing No. 1 was designed to meet the contract requirements, but he does not mention the cul-de-sacs or the pod design that the Corps wanted. In his opinion, Drawing No. 1 "utilized potential advantages of the site . . . ." *Id.* at ¶ 9.

Paragraph 10 contains similar conclusions, except for Mr. DiSimone's assertion that "the rejection of Drawing No. 1 represented a clear violation of this provision of the Contract," which is a legal conclusion. *Id.* at ¶ 10. It does not matter whether the Corps obtained the most economical or the best use of its site by requiring pods or cul-de-sacs. Defendant issued an RFP requiring those features and plaintiff won the Contract by submitting a compliant site design.

Mr. DiSimone states in paragraph 10 that the Government "required Sea Crest to build three pods in loops." *Id.* at ¶ 10. We do not see the point of this assertion. "In fact, the pods represent an aberrant massing design and is not consistent with any other housing development built at West Point. Building pods and forcing the site to fit the design was extremely costly." *Id.* This is the job that plaintiff bid. Sea Crest submitted a site plan that included this "costly" design work. The Government awarded plaintiff the Contract based in part on this plan.

Paragraph 11 is mostly irrelevant for the purposes of this motion. Whether the pod layout was the best use of the site is not important from a legal standpoint. The issue is whether plaintiff bid on this layout. The remainder of Mr. DiSimone's affidavit addresses delay and impact issues. We will consider these matters at trial.

Mr. Soyka was the consulting engineer for Sea Crest on the Project. His affidavit is similar to some of plaintiff's arguments and testimony in that it begins just beyond an important issue. He states that he attended a pre-work meeting on October 6, 1995. "The purpose of this meeting was to present revisions to the site plan for Stoney Lonesome II in order to minimize rock drilling and blasting. That conceptual schematic layout was presented in the form of a scale drawing . . . ." (Soyka Aff. ¶ 2).

This avoids the issue of why Sea Crest, having won the Contract with a drawing that it knew defendant would accept, changed the design. Plaintiff has not alleged that the Government negotiated an amendment that permitted design changes to save costs. If the Corps had been willing to change its site plan to save Sea Crest the costs of rock excavation, it seems likely that defendant would have been more receptive to plaintiff's request for an excavation allowance pre-BAFO. Affiant states in paragraph 4 that the new plan "worked better with the existing terrain . . . [and] the number of trees to be destroyed was reduced." *Id.* at ¶ 2. This plan is not the one that plaintiff offered to use, however, and not the plan that defendant agreed to pay for.

Mr. Soyka states in paragraph 5 that plaintiff's new concept was "summarily dismissed as 'Row Housing'" by DHPW. He adds, "Sea Crest was informed . . . that the Quad concept was the reason that it was awarded the Contract, and Quads would therefore have to be built." *Id.* at ¶ 5. This comports with our understanding of the importance that a quad or pod or cul-de-sac design held in this competition so far as the Corps was concerned.

Mr. Riverso is a Professional Engineer, testifying as an expert for plaintiff Sea Crest. His affidavit states in paragraph 3 that Sea Crest's proposals for the project were condi-

tioned on certain site work allowances. Sea Crest removed these reservations later at the Government's direction.

Affiant states that the Contracting Officer's " 'findings of fact' are based on flawed interpretations of what transpired during contract negotiations." (Riverso Aff. ¶ 3). This is a statement of Mr. Riverso's conclusions. He makes no effort to state facts that the court can use to deny summary judgment on the issue of Drawing No. 1. He addresses briefly Sea Crest's "rightful design/build discretion," but does not explain what this means or give examples. He states that plaintiff "incurred significant cost increases when it was denied any site design discretion." *Id.* He does not say what these costs were or how they were related to plaintiff's lack of design discretion. His opinion is that plaintiff was denied certain economies of scale because it was not allowed to use Drawing No. 1.

Mr. Haberbusch is plaintiff's attorney in this lawsuit. His affidavit addresses primarily the Rule 56(f) motion that became moot when we dismissed the Drawing No. 1 issue on summary judgment. Mr. Haberbusch may depose Mr. Passantino and other witnesses whom plaintiff reasonably wishes to question in preparing for trial on impact and delay damages. This affidavit questions Mr. Passantino's authority as Administrative Contracting Officer. We are not aware that plaintiff has raised this matter previously.[5] Authority to act for the Government is a legal issue that we can resolve at a hearing if necessary. The parties should advise the court whether they wish to schedule arguments for this purpose.

### II. Rule 56(f)

We granted the Government's motion for summary judgment as it applied to Drawing No. 1 on January 8, and denied as Moot plaintiff's request to conduct discovery on that issue. RCFC 56(f) gives the court discretion to allow a party to conduct discovery prior to arguments on summary judgment. "Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court … may order a continuance to permit … depositions to be taken or discovery to be had or may make such other order as is just." RCFC 56(f).

Sea Crest argues that its motion was not moot because plaintiff was entitled to "test the veracity" of a deponent whom the court cited in deciding the motion for summary judgment. The motion was moot because we ruled on summary judgment that defendant was justified in rejecting Drawing No. 1 as nonconforming. This was an issue of contract interpretation. We rejected defendant's motion for summary judgment on plaintiff's delay damages claim. Plaintiff will have ample opportunity to depose the individual in question, Mr. Passantino, prior to trial. Sea Crest has requested three months of discovery.

Plaintiff's objections to our Rule 56(f) ruling seem related to its interpretation of the Rule itself. In fact, the motion was moot because of the court's ruling against plaintiff on the legal issue of whether the Contract permitted defendant to reject Drawing No. 1 as nonconforming. Discovery was not necessary or appropriate once the court ruled as a matter of law that defendant acted within its rights in rejecting Drawing No. 1 in the circumstances presented.

### CONCLUSION

It does not matter whether the Corps obtained the most economical or the best use of its site by requiring pods or cul-de-sacs. Defendant issued an RFP requiring those features and plaintiff won the Contract by submitting a compliant site design. Plaintiff will have an opportunity at trial to argue that the Corps was slow and uncertain in deciding how many units to put on the site. Sea Crest may be entitled to damages if it can

---

**5.** Mr. DiSimone stated in his affidavit that "Sea Crest had *no* dealings with [Contracting Officer] Ms. Snell over the course of the Project. She appointed Mr. Passantino Administrative Contracting Officer on the project, to whom she effectively delegated her contract duties." (DiSimone Aff. ¶ 22).

show that the project resulted in added costs because of government delays.

Plaintiff's motion for reconsideration is DENIED. Counsel should complete discovery by May 15. We hope to try the remainder of this case before the end of June. The parties may contact the court to discuss means of expediting this case, or to address pretrial issues. They may raise legal issues such as authority at any time.